**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:05cr477

JOHN ALVESTER WOOD


**MEMORANDUM OPINION**

This matter is before the Court on the request of the United States, at the suggestion of the Bureau of Prisons ("BOP") that the BOP be authorized immediately to medicate defendant John Alvester Wood with antipsychotic drugs to restore his competency to proceed to sentencing.  For the following reasons, the request is granted, but the suggestion of the Untied States that a provisional sentence be imposed is rejected.


**BACKGROUND FACTS AND PROCEDURAL HISTORY**

The United States alleges that, between May 6 and May 13, 2005, John Alvester Wood, a 24-year-old male with a substantial psychiatric history, made by telephone several false bomb threats in and around Richmond.  In the first call, on May 6, the United States alleges that Mr. Wood told police that he was a white male dressed in all white with a bomb strapped to his body, and that he would blow himself up at the State Capitol if he did not receive two million dollars within the hour.  Police searched the area but found nobody matching his description.

On  May 13, Mr. Wood allegedly went on a spree.  First, he called police and told them that he was in a black Lincoln Navigator outside of "Warner's Mansion," that he was dressed in all black, and that he would blow himself up of he did not receive a check for ten million dollars.  Not long thereafter, Mr. Wood told police that, along with six white accomplices dressed all in white, carrying bombs, and communicating via walkie-talkies, he was inside the Richmond International Raceway and would blow himself up if he did not receive a check for three million dollars.  Again on the same day, Mr. Wood called and claimed that he had planted bombs at George Wythe High School.  Police responded to all these calls by searching the premises, but found nothing.

Police traced Mr. Wood's phone and arrested him on May 17, 2005. He was charged with making threatening communications in violation of 18 U.S.C. § 875(b) and interference with commerce by threats of violence in violation of 18 U.S.C. § 1951(a).

Pursuant to 18 U.S.C. § 4241(a), a Magistrate Judge ordered that Mr. Wood undergo a four-month pre-trial psychiatric evaluation (and accompanying treatment) at Federal Correctional Institution at Butner, North Carolina ("FCI Butner"), to determine whether he was competent to stand trial.  On October 25, evaluators at FCI Butner issued a Forensic Evaluation (the "First Evaluation").  Mr. Wood, the evaluation recounted, had been diagnosed with Schizophrenia, Paranoid Type, and had an extensive history of hospitalization and

2

medication.   In February 2005, three months before the alleged crimes, Mr. Wood had been released from his fifth stay at Virginia's Central State Hospital; and, at the time the offenses occurred, he was living in a group home, Special Care for Special People.

Mr. Wood had been taking psychotropic drugs since his release from the state hospital, but he had stopped a few days before the offenses because the side-effects made him uncomfortable.  Mr. Wood reported that shortly after he stopped taking the medication, he began to experience auditory hallucinations.  A male voice ordered Mr. Wood to place the phone calls, and threatened to "get [Mr. Wood] hit by a car or stop his heart" if Mr. Wood did not follow his instructions.

The First Evaluation concluded that the medications administered to Mr. Wood during the evaluation period had been successful, and that Mr. Wood was competent to stand trial.  It cautioned, though, that Mr. Wood would have to continue to take the prescribed medication in order to remain competent.

On November 2, before the Magistrate Judge, Mr. Wood pled guilty to a criminal information charging false bomb threats by a telephone in violation of 18 U.S.C. § 844(e), a class C felony that carries a maximum of 10 years in prison.  The plea colloquy was very thorough, and probed the availability of an insanity defense

and whether Mr. Wood desired to avail himself of that defense.  Mr. Wood declined to plead not guilty by reason of insanity.

At the sentencing hearing on February 17, 2006, the Court, based on statements made by Mr. Wood, continued the sentencing and instructed that he be evaluated to determine if, at the time he allegedly phoned in the bomb threats, he had the mental state necessary to be convicted for the offense.  Dr. Michelle K. Nelson, a psychologist retained by the Federal Public Defender, attempted to evaluate Mr. Wood pursuant to the Court's instructions.  On March 20, Dr. Nelson reported that she was unable fully to evaluate Mr. Wood because his "mental state ha[d] decompensated."  Dr. Nelson reported that, according to the jail staff, Mr. Wood had stopped complying with his medication regimen at some time after his guilty plea.  Dr. Nelson did report, however, that Mr. Wood suffered from "paranoid and grandiose delusions," that he had "ideas of reference" (he believed he was receiving secret messages via radio music), and that he had "pressured speech and tangential thought processes."  Dr. Nelson also concluded that Mr. Wood could be restored to competence with medication.  On April 7, after considering Dr. Nelson's report, the Court, pursuant to 18 U.S.C. § 4241(a), ordered that Mr. Wood be returned to FCI Butner for a period of evaluation and for continued treatment, to determine whether it was probable that he could be restored to competence.

On August 8, the doctors at FCI Butner issued another forensic evaluation and diagnosis (the "Second Evaluation"), this one in response to the Order issued on April 7, 2005.  The Second Evaluation diagnosed Mr. Wood as suffering from Schizoaffective Disorder, Bipolar type.  Persons suffering from the this disorder can simultaneously experience Bipolar Disorder symptoms (a depressive, manic, or mixed episode) along with symptoms of Schizophrenia (distorted perceptions of reality characterized by hallucinations, delusions, and formal thought disorder; diminution or loss of normal social functions and resulting apathy, asociality, and inattention; and distracted speech, disorganized or bizarre behavior, and unusual appearance).

The doctors further reported that Mr. Wood had ceased to comply with his medication regimen.  As a result he had been rendered incompetent to "work with his attorney to plan a legal strategy," or to testify adequately on his own behalf if it were decided that he should do so.

The doctors concluded that Mr. Wood could be rendered competent by the administration of psychotropic medication, but that he would not willingly take the medication necessary to restore him to competency.  The evaluators therefore requested that the Court order that Mr. Wood be involuntarily medicated under the authority set forth in Sell v. United States, 539 U.S. 166 (2003).

5

On August 31, the Court ordered counsel for Mr. Wood and the United States to provide the Court with memoranda addressing two questions: (1) whether, in light of the Second Evaluation, Mr. Wood's guilty plea of November 2, 2005 was provident, knowing, voluntary, and thus binding; and (2) if the guilty plea was provident, knowing, and voluntary, what is the appropriate authority for forcibly administering medication to Mr. Wood in order to render him competent for sentencing.

The United States and the Defendant agree that the guilty plea was knowingly and voluntarily made.  They also agree that the Defendant was fully competent when the guilty plea was entered.

Likewise, the parties agree that the Defendant should be forcibly medicated in order to render him competent to be sentenced.  They differ considerably, however, respecting how the sentencing process should be accomplished.

The Defendant asserts that forcible medication should be ordered to restore the defendant to competence.  Then, says the Defendant, sentencing should proceed.  The United States argues that, under 18 U.S.C. § 4244(d), the Defendant should be provisionally sentenced for purposes of medicating him with a view to restoring his competence.  Then, says the United States, the Court can "revisit" the sentence once the defendant is restored to competence.

6

**DISCUSSION**

**A.   Was Mr. Wood's Guilty Plea Of November 2, 2005, Knowing, Provident, And Voluntary?**

Both parties agree that Mr. Wood's November 2, 2005 guilty plea was knowing, provident, and voluntary.  For the reasons stated below, the Court finds that the plea was indeed knowing, provident, and voluntary.

In Dusky v. United States, the Supreme Court explained that, in order ensure that a defendant is competent to stand trial, the trial court must determine "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him."  362 U.S. 402, 402 (1960).   On May 18, 2005, the Magistrate Judge ordered that Mr. Wood undergo a pre-trial psychiatric evaluation at FCI Butner, pursuant to 18 U.S.C. §§ 4241(a) and 4247(b) and (c).

On October 25, 2005, after Mr. Wood's treatment had been extended for a month, officials at FCI Butner filed with the Court a Certificate of Restoration fo Competency to Stand Trial, stating that Mr. Wood was "able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense."  Mr. Wood was then returned to Northern Neck Regional Jail to await trial.

Defense counsel represented that she spoke with Mr. Wood on two separate occasions between October 25, 2005 and the November 2,

2005 plea hearing, and that she found him "lucid, able to understand the charges, able to reason and determine what would be best for him and his own interests." Counsel states that she also discussed the defense of insanity with Mr. Wood, and that, after reflection, he chose not to assert it. Defendant's Memorandum in Response to the August 31, 2006 Briefing Order at 3-4.

At the November 2, 2005 plea hearing, the Magistrate Judge "conducted a very long an detailed" colloquy in which he specifically raised the issue of Mr. Wood's competence, as well as the possibility of an insanity defense. After conducting the inquiry, the Magistrate Judge was satisfied: that Mr. Wood understood the proceedings against him; that Mr. Wood was competent; and that Mr. Wood knowingly had elected not to assert the affirmative defense of insanity. Thereupon, the Magistrate Judge accepted his guilty plea. Id. See also Response of United States to August 31, 2006 Briefing Order at 2-3.

Based on the Dusky criteria, the Court finds, by clear and convincing evidence, that Mr. Wood was competent to enter a guilty plea because he was able to consult with his lawyer with a reasonable degree of rational understanding, and because he had a rational and factual understanding of the proceedings against him. Moreover, the Court finds that Mr. Wood knowingly elected not to assert an insanity defense. Mr. Wood's guilty plea was provident, knowing, and voluntary.

8

**B.    Authority For Forcibly Administering Medication To Restore A Defendant To Competency For Sentencing**

The Fourth Circuit has held that the standard set forth by the Supreme Court in Sell, which controls when the United States may involuntarily medicate a defendant with antipsychotic drugs to render him competent to stand trial, also governs involuntary medications administered for the purpose of rendering defendants competent for sentencing.  United States v. Baldovinos, 434 F.3d 233, 235 (4th Cir. 2006).[1]  Therefore, Sell provides the analytical framework for determining whether Mr. Wood may be involuntarily medicated.

Sell outlined a four-part standard for determining when a patient may be involuntarily medicated.  First, the court must find that important governmental interests are at stake.  Sell, 539 U.S. at 180.  Second, the court must find that involuntary medication

_____

[1] Sell instructed district courts that are "asked to approve forced administration of drugs for purposes of rendering a defendant competent" to "determine whether the Government seeks, or has first sought" permission to administer drugs under Washington v. Harper, 494 U.S. 210 (1990), which covers involuntary medication administered to inmates on the grounds that they are gravely ill or that their mental illness renders them a threat to themselves or others.  Sell, 539 U.S. at 183.  The Fourth Circuit has interpreted this to mean that "for Harper to govern the analysis . . . the Government must show that the prevention of such harm was one of the purposes for which it sough authorization to medicate him." Baldovinos, 434 F.3d at 241.  In this case, physicians at FCI Butner have concluded that Mr. Wood is neither gravely ill nor a danger to himself or others, see Second Evaluation at 12, and thus he does not qualify for medication under Harper.  In any event the United States has requested medication to render Mr. Wood competent for sentencing, not for the reasons covered by Harper.  Sell therefore governs the Court's analysis.

9

will significantly further those interests.  Id. at 181.  Third,
the court must concluded that involuntary medication is necessary
to further those interests.  Id.  Fourth, the court must conclude
that administration of the drugs is medically appropriate.

In the Second Evaluation, Mr. Wood's doctors propose to
restore Mr. Wood to competency by injecting him biweekly with 25-
to 50- milligram doses of haloperidol decanoate, and to administer
several medications to Mr. Wood should he experience common side
effects.  Second Evaluation at 22.  Should Mr. Wood, when
confronted with an injection, elect to take medication orally, the
doctors at FCI Butner propose to administer a "Second Generation"
antipsychotic medication, which tends to have fewer side effects.
Id. at 16-17, 23.  Under this medication regimen, the physicians
believe that "there is a substantial probability that Mr. Wood's
competency can be restored . . . ."  Id. at 23.  The proposed
treatment program would last approximately four months.  Id. at
cover page.

For the reasons stated below, the Court finds that, as
proposed in the Second Evaluation, and as permitted by the
application of the principles in Sell, medication may be forcibly
administered to Mr. Wood to render him competent for sentencing.
The Court treats Sell's first standard as a legal matter, on which
the Court rules as a matter of law.  Sell's second, third, and
fourth standards are questions of fact, as to which the Court makes

findings under a clear-and-convincing evidentiary standard of proof.[2]

### 1.   Governmental Interest

Sell first requires a court to find that important governmental interests are at stake. 539 U.S. at 180. Sell dealt with an involuntary medication designed to render a defendant competent to stand trial. Id. at 175. While the Fourth Circuit has held that Sell governs a court's analysis when the government seeks involuntarily to medicate a defendant for sentencing, Baldovinos, 434 F.3d at 235, it has left unresolved whether the government's interest in sentencing a defendant is of sufficient importance to pass muster under Sell. Id. at 240 n.7 ("[I]t appears unresolved whether the Sell principles permit the

---

[2] Sell did not articulate a standard of proof to govern consideration of these criteria, and the Fourth Circuit has yet to speak on the issue. However, Sell's second, third, and fourth criteria rather clearly are questions of fact, and at least two circuits have determined that considering the liberty interest at stake in a Sell medication, the Due Process Clause requires the district court to make findings of fact by clear and convincing evidence. See United States v. Gomes, 387 F.3d 157 (2d Cir. 2004); United States v. Bradley, 417 F.3d 1107 (10th Cir. 2005). Those decisions are well-reasoned and persuasive. Sell's first standard--whether the government has an important interest in the involuntary medication--is strictly a question of law, to which standards of proof for factual issues do not apply. See California ex rel. Cooper v. Mitchell Bros' Santa Ana Theater, 454 U.S. 90 (1981) ("The purpose of a standard of proof is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.")(quotations omitted)(emphasis added).

Government to involuntarily medicate a defendant for the purpose of rendering him competent to be sentenced.").

The issue is clearly presented here and the Court holds that the government's interest in having a defendant medicated for the purpose of rendering him competent for sentencing is an important governmental interest because doing so furthers Congress' goal that the sentence a defendant receives should accurately reflect the real nature of his offense, and should be tailored to the defendant's circumstances. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court made clear that the Government has an important interest in enforcing the Federal Sentencing Act (the "Sentencing Act") and the Sentencing Guidelines that the Sentencing Act created. Congress passed the Sentencing Act and created the Guidelines to provide reasonable, consistent sentences that applied to all those who, with similar criminal histories, engaged in similar criminal conduct. In so doing, Congress noted the existence of significant sentencing disparities created in part by, on the one hand, statutes that provided wide sentencing ranges, and, on the other, statutory definitions of a particular crime that frequently could, and often did, "encompass a vast range of very different kinds of underlying conduct." Booker, 543 U.S. at 250-51. This is so even in relatively ordinary crimes, like robbery, "where an act that meets the statutory definition can be committed in a host of different ways," id. at 251, with different

12

corresponding levels of actual culpability, dangerousness, and thus, appropriate period of incarceration.

Congress' "basic goal" in passing the Sentencing Act was to move toward a system of greater uniformity--but the uniformity that Congress envisioned was not focused on achieving "similar sentences for those convicted of violations of the same statute;" rather, Congress's "more important[]" goal was to achieve "similar relationships between sentences and real conduct." Id. at 253-54.

Achieving this goal, in turn, "depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction." Id. at 250. To this end, Congress combined the Sentencing Guidelines with 18 U.S.C. § 3553(a), which instructs the courts to impose sentences "sufficient, but not greater than necessary" to provide just punishment, deter criminal conduct, protect the public, and rehabilitate the defendant.[3] Id.

The upshot of Congress' efforts is a system designed to fine-tune the repercussions that defendants face for committing crimes. Even after Booker rendered the Sentencing Guidelines advisory rather than mandatory, Booker, 543 U.S. at 757, courts still use

---

[3] If, upon considering the real nature of the defendant's act, a court finds that the factors in section 3553(a) counseled a sentence different than that prescribed by the Sentencing Guidelines, the court may make an upward or downward departure from the Guideline range. See 18 U.S.C. §§ 3553(a), (b)(1); United States v. Green, 436 F.3d 449 (4th Cir. 2006).

the Guidelines as a jumping-off point, id. at 767;  United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005), and, when combined with the Court's inquiry pursuant to section 3553(a), the pre-sentence evidence gathered by a court and the witnesses, documents, and testimony produced at the sentencing hearing can impact the length of a defendant's prison term dramatically.   If the sentencing phase of a federal criminal prosecution is not quite a "tail which wags the dog of the substantive offense," McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986), it is nonetheless a critical step in the criminal justice process that Congress designed.

While incarcerating a defendant by means of a provisional sentence under 18 U.S.C. § 4244(d) is sometimes unavoidable, the Government, in light of Congress' articulated sentencing goals, has an interest in achieving an actual sentence where that is possible. Rather than look to the real nature of an offense, the "provisional" sentence specified in § 4244(d) defaults to the maximum sentence allowed under the applicable statute.   United States v. Roberts, 915 F.2d 889, 892 (4th Cir. 1990).   This shortcuts the factfinding procedure created by the Sentencing Act, and arrives at an accurate sentence only by coincidence.  Where it is reasonably possible to do so, the Government has an interest in avoiding this outcome.

In other words, there is a very important, legislatively articulated, governmental interest in achieving fair, reasonable

14

and non-disparate sentences for similarly situated defendants who have engaged in similar conduct.  Reasonable, constitutionally acceptable measures that help achieve that interest are likewise important governmental interests.  The forcible administration of medication to restore competence for sentencing is such an interest.

Where the Government has an important interest in involuntarily medicating a defendant, Sell also requires that the court consider the facts of the individual case, because there may be "special circumstances" that render the interest less exigent. Sell 539 U.S. at 180.  As one of its examples, Sell suggested that, where a defendant already has been confined for a significant amount of time and would receive credit for time served in the event of a conviction, the government may have less interest in having him stand trial.  Id.  The Tenth Circuit has read this example to suggest that, when the amount of time a defendant is confined pending proceedings "is in parity with an expected sentence," the Government's interest in the proceeding becomes less important.  United States v. Bradley, 417 F.3d 1107, 1116 (10th Cir. 2005).

The converse follows: if there is a great disparity between the length of a "provisional" sentence under 18 U.S.C. § 4244(d) and the length of the sentence a defendant is expected to receive as the result of an actual sentencing, the Government

15

correspondingly has a important interest in carrying out Congress's intention that the sentence which a defendant receives reflect the defendant's actual conduct.  In such an eventuality, no "special circumstance" applies.

This case is the archetype of such a disparity.  Sentences imposed pursuant to 18 U.S.C. § 4244(d) default to the statutory maximum.  Roberts, 915 F.2d at 892.  Here, Mr. Wood stands guilty of a Class C felony that carries a maximum penalty of ten years' imprisonment.  Under the Sentencing Guidelines, however, Mr. Wood, with a criminal history category of V and an adjusted offense level of 12, see Presentence Investigation Report at 20, has a recommended sentence of 27-33 months--around one quarter of the time he would receive under  section 4244(d).  In addition, Mr. Wood has moved for a downward departure on the ground that he had diminished mental capacity at the time he committed the crime, and that his criminal hisotry over-represents the seriousness of his prior convictions.  Defendant's Sentencing Memorandum (Docket # 24).  Over-representation of criminal history and diminished mental capacity are both encouraged bases for departure under the Sentencing Guidelines.  See  United States Sentencing Guidelines §§ 4.A1.3(b), 5K2.13.  If the Court were downwardly to depart on either ground, or both, Mr. Wood's period of incarceration likely would be considerably shorter than that called for by the advisory guidelines, and a small fraction of the statutory maximum.

16

Because there is a great disparity between Mr. Wood's expected sentence with a sentencing hearing (after restoration to competence) and his "provisional" sentence without a sentencing hearing (subject to sentence revision later), no "special circumstance" exists that would reduce the importance of the Government's interest in having Mr. Wood receive an actual sentence pursuant to the Sentencing Act.  That, in turn, also means, on the facts of this record, that the governmental interest in forcibly administering medication to restore competence to Mr. Wood for purposes of sentencing is an important governmental interest within the meaning of Sell.

### 2.   Will Forcible Medication Further The Important Governmental Interest?

Sell requires that the involuntary medication significantly further the government's interest in rendering the defendant competent.  539 U.S. at 181.  Specifically, the court must find that the administration of drugs is both substantially likely to render the defendant competent to stand trial and, at the same time, substantially unlikely to have side effects that will interfere significantly with the his ability to assist counsel. Id.

The medication regimen proposed by the physicians at FCI Butner is designed to reduce Mr. Wood's auditory hallucinations and delusional beliefs, as well as to decrease his cognitive disorganization.  The proposed medical regimen also is designed to

17

restore more normal thought processes, and to improve both Mr. Wood's level of cognitive functioning in the courtroom and his ability to assist his attorney.   Second Evaluation at 20.   The Court finds that the medication regimen proposed by FCI Butner will significantly further the United States's interest in sentencing Mr. Wood.

First, the medication is substantially likely to render Mr. Wood competent to be sentenced.   Indeed, the medication restored Mr. Wood to competence previously; and, although the Second Evaluation cautions that responses to treatment are highly individual, it cites a study showing that, of 46 individuals who were involuntarily medicated, 93 percent had an unequivocally good clinical response, and 87 percent were restored to competency to stand trial.   Second Evaluation at 19.

Second, the proposed medication regimen is substantially unlikely to produce side effects that would interfere with Mr. Wood's ability to assist his attorney in preparing his defense or that would be harmful to him.   FCI Butner reports that Mr. Wood does not have any underlying brain disease that would make him susceptible to the more severe side effects from the drugs, and that sedation is not generally a significant side effect of the proposed medication regimen.   Id. at 20.

For these reasons, the Court finds, by clear and convincing evidence, that the medication regimen proposed in the Second Evaluation satisfies the second <u>Sell</u> criterion.

### 3.   Is Involuntary Medication Necessary?

Under <u>Sell</u>, the involuntary medication also must be necessary. <u>Sell</u>, 539 U.S. at 181.  The court must find that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results."  <u>Id.</u>  The court must also consider less intrusive means for administering the drugs, such as a court order to the defendant backed by the contempt power, before turning to more intrusive ones.  <u>Id.</u>

The proposed regimen appears unlikely to harm Mr. Wood. Alternative, less intrusive treatments are unlikely to achieve the same results as medication.  FCI Butner reports that Mr. Wood does not believe that he has a mental illness.  He does not believe that he is in need of treatment of any type, and is therefore unlikely to engage in psychotherapy.  Second Evaluation at 20.  By the same token, it is unlikely that a court order would overcome Mr. Wood's defiance because Mr. Wood is "highly resistant" to treatment.  <u>Id.</u> at 7.  He has refused to take prescribed medications, and has been extremely uncooperative with, and evasive toward, staff when they confront him with his non-compliance.  <u>Id.</u> at 7-8.  Moreover, Mr. Wood's illness impairs his ability to comply with instructions, <u>id.</u> at 20, and he harbors elaborate delusions that involve the correctional system generally and his caretakers in particular in

conspiracies against him.  Id. at 6.  From these facts, the Court concludes that a court order to take medication backed by the contempt power would be of little moment to Mr. Wood, and is unlikely to be effective.

For these reasons, the Court finds, by clear and convincing evidence, that the involuntary medication proposed in the Second Evaluation meets Sell's third criterion.

### 4.   Is Administrative Of The Medication Medically Appropriate?

Finally, the court must find that administration of the drugs is medically appropriate--that is, that such administration is "in the patient's best medical interest in light of his medical condition." Sell, 539 U.S. at 181.  The record fully supports such a finding.

The proposed medication regimen is likely to restore Mr. Wood to competence.  In other words, it is medically appropriate to achieve a legitimate end.

The proposed regimen appears unlikely to harm Mr. Wood.  Mr. Wood does not have any underlying medical conditions that would preclude, or be worsened by, the use of antipsychotic medication. Second Evaluation at 21.  More generally, while antipsychotic medication can have some negative side effects, there are significant risks associated with not treating Schizophrenia. Schizophrenia is a chronic disease that worsens if left untreated. Id.  It impairs social functioning of all types, and contributes to an increased risk of suicide.  Id.  Individuals who suffer from

schizophrenia have shorter life expectancies, and are at higher risk for fatal accidents cause by their impaired thinking. Id. at 22. Furthermore, there is evidence that early treatment of Schizophrenia improves patients' chances of recovery, and that the longer patients remain untreated, the more uncertain their prospects for long term recovery become. Id. at 21. For these reasons, the Court finds, by clear and convincing evidence, that the medication plan satisfies Sell's fourth criterion.

## CONCLUSION

Having considered the Sell factors and Mr. Wood's incompetence to be sentenced, and having concluded that all of the Sell factors have been satisfied, the Court will order that:

1.   The Government's request that Mr. Wood be provisionally sentenced pursuant to 18 U.S.C. § 4244(d) is DENIED;

2.   The Government's request that Mr. Wood be medicated involuntarily in order to render him competent to be sentenced is hereby GRANTED, subject to the following conditions:

   a.   FCI Butner personnel shall provide Mr. Wood with a copy of this Order and Memorandum Opinion;

   b.   Mr. Wood is to be medicated in accord with the medication plan outlined on pages 22-23 of Butner's August 8, 2006 Forensic Evaluation (the "Second Evaluation");

   c.   All medical personnel treating Mr. Wood shall request that he voluntarily take medication orally

21

before each and every administration of medication by injection; and if Mr. Wood does not agree to take medication orally within five (5) days of the date of this Order for the first dosage and, within the times necessary to achieve results under the medical plan for all subsequent orders, FCI Butner personnel are authorized to administer the medication by injection;

3.   Mr. Wood's commitment pursuant to 18 U.S.C. § 4214(d)(2)(A) is hereby continued for a period of four months, or a lesser period if reasonably sufficient to restore him to competency.   At the end of four months, or when Mr. Wood's competency is restored, if that occurs sooner, FCI Butner shall file a report with the Court detailing the results of treatment. If doctors conclude that Mr. Wood has been restored to competence for sentencing, they must also set forth what side effects, if any, Mr. Wood has experienced on the medication, and how the medication will affect Mr. Wood during sentencing.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record and to the Warden at FCI Butner by facsimile and regular mail.

It is so ORDERED.


                                  /s/
                          Robert E. Payne
                          United States District Judge

Richmond, Virginia

22

Date: September 29, 2006